# MAY, 1941

GULF OIL CORPORATLON ET AL V. REX C. OUTLAW ET AL.

No. 7727. Decided April 2, 1941.
Rehearing Overruled May 7, 1941.
(150 S. W., 2d Series, 777.)

*Wm. H. Burgess,* of El Paso, *Whitaker, Perkins & Turpin,* of Midland, *H. L. Stone,* of San Angelo, *John E. Green, Jr.,* of Houston, *James & Conner, W. E. Allen, Wm. L. Wise,* and *Peverill O. Settle,* all of Fort Worth, for plaintiffs in error.

The evidence showing that the purpose of the resurvey was to determine the amount of the excess acreage in the section

of land in order that the owner might pay for said land including the excess and obtain a patent therefor; that it was the intention of the Land Commissioner, the owner and the surveyor that said resurvey should contain the whole of said section and it was their belief that it did and that the patent included of the section. It was therefore not error for the trial court to peremptorily instruct the jury to return a verdict for the plaintiffs. Johnson v. Knippa, 127 S. W. 905; Woods v. Robinson, 58 Texas 655; Wyatt v. Foster, 79 Texas 413, 15 S. W. 679.

*Massingill & Belew, Hill & Paddock* and *Ben H. Terrel,* all of Fort Worth, *Gerald C. Mann,* Attorney General of Texas, *Robt. E. Kepke* and *James Noel,* Assistant Attorney General, for defendants in error.

The court erred in instructing a verdict for plaintiffs because a material issue as to the true location of the boundary as surveyed and patented by the State was raised by the pleadings and the evidence and as the evidence on this issue was conflicting it should have been submitted under proper instructions to the jury. Austin v. Dungan, 46 Texas 236; Stafford v. Kind, 30 Texas 257; 7 Tex. Jur. 149.

*Bascom Giles,* Commissioner of the General Land Office of Texas and *W. T. Williams,* of Austin, filed briefs as amici curiae.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

This suit was instituted by Clarence Scharbauer, Gulf Oil Corporation and Federal Royalties Company as plaintiffs, and they will be so referred to herein. Rex. C. Outlaw was named as defendant and will be so designated here. The State of Texas intervened and it will be referred to as the State. The suit involves title to a strip of land about 31 1/2 varas wide and 1900 varas in length, containing 10.6 acres. The district court instructed a verdict in favor of plaintiffs. The Court of Civil Appeals reversed and remanded the cause, holding that an issue of fact was raised by the evidence which should have been submitted to the jury. 137 S. W. (2d) 789.

Before discussing the merits of the case it becomes necessary to notice briefly a question pertaining to jurisdiction.

Final judgment was entered in this cause July 14, 1938. Notice of appeal was given, but appeal was not perfected. On January 4, 1939, petition for writ of error was filed. The appeal

by writ of error was perfected in the Court of Civil Appeals March 17, 1939. The Court of Civil Appeals decided the case January 18, 1940, after what is known as Senate Bill No. 69 became effective. Motion was made in the Court of Civil Appeals to dismiss the appeal and same was overruled. The question has been brought here in the application for writ of error.

The pertinent portions of the Act in question are as follows:

"Sec. 1. No party who participates either in person or by his attorney in the actual trial of the case in the trial court shall be entitled to review by the Court of Civil Appeals through means of writ of error.

"Sec. 2. All laws and parts of laws, insofar as they conflict with this Act, are repealed. Writ of error shall continue to be available under the rules and regulations of the law to a party who does not participate in the trial of the case in the trial court.

"Sec. 3. It is hereby provided that this Act shall take effect from and after January 1, 1940."

After mature consideration it is announced as the conclusion of the Court that the Act mentioned was not intended to apply to causes where appeal by writ of error was fully perfected prior to the effective date of same, towit, January 2, 1940. In this instance appeal had been perfected in the Court of Civil Appeals before the Act was ever passed by the Legislature. While not approving the reasoning of the Court of Civil Appeals upon this question, its judgment in this respect is sustained.

Plaintiff Scharbauer is owner of Sections 21, 22, 27, 28 and other sections in Block 44, T I S (Township 1 South) T. & P. Ry. Co., Ector County, Texas. Defendant Gulf Oil Corporation holds an oil, gas and mineral lease on these sections under Scharbauer, while defendant Federal Royalties Company owns a royalty interest under said leases. Plaintiffs sued for the strip of land in controversy as a part of Sections 21, 22, 27 and 28. Defendant Outlaw claims a mineral permit upon the strip of land in controversy issued by the Commissioner of the General Land Office August 13, 1937. The State of Texas claims the land as a part of the public domain, subject to the mineral permit issued to Outlaw.

Prior to March 7, 1876, Texas & Pacific Ry. Co. owned 24 land certificates issued under the Act of May 2, 1873, which entitled it to survey 48 sections of land, of which 24 sections would be its property, and the remaining 24 sections would be-

long to the public school fund. On or about March 7, 1876, B. L. Cunningham surveyed Block 44, T 1 S, by virtue of said certificates. In doing this work he surveyed upon the ground only the outside lines of the block. He returned to the General Land Office the field notes of his work and also a plat. The field notes and plat showed that he divided said block into 48 sections, calling for each to be approximately 1900 varas square. It is admitted by all parties that he did not make any actual survey of any of the sections, but that the field notes, other than the outside lines of the block, were entirely office work.

Thereafter the odd numbered sections were patented to the railway company by section, block and certificate numbers, and each of the sections was described as being 1900 varas square. Later, the State sold the 24 even numbered sections. J. C. Beaty purchased four of these sections, including Section 22. These even numbered sections appeared on the map by Cunningham which had been returned to the General Land Office as being 1900 varas square. Section 22 was sold to Beaty as "Section 22, Block 44, Cert. 4352, T. & P. Ry., 640 acres." It appears to have been valued at $1.50 per acre. The four sections purchased by Beaty, as well as a number of others, were conveyed to J. W. Buchanan, and became a part of what was known as the "J. W. Buchanan Ranch." In 1912 Buchanan obtained a loan, and in connection with this loan it became necessary to obtain patents covering the even numbered surveys. Buchanan, through his agent, advised the Commissioner of the General Land Office that he desired to pay out and obtain patents to twelve of the even numbered sections, including Section 22. Under date of October 1, 1912, the Commissioner advised Buchanan that there appeared to be an excess in Block 44, and that corrected field notes would be required before patents could issue. He further advised that when corrected field notes were filed, the sections fully paid out, including excess, and patent fees deposited, the land would be subject to patent. It appears to be undisputed that the resurvey and return of corrected field notes was to determine the excess, and to properly allocate it to the even numbered surveys, so that the State could collect for the excess acreage in each section.

Pursuant to said instructions Buchanan obtained the services of J. R. Wadsworth, County Surveyor of Ector County, to resurvey ten of the even numbered sections in said Block 44, including Sections 22, 26 and 28. In doing this work it appears undisputed that Wadsworth undertook, first, to establish certain lines and corners of odd numbered sections which adjoined

the even numbered sections which he was to survey. His purpose in doing this was to reduce the acreage in said odd numbered sections to exactly 640 acres, with their boundaries fixed at approximately 1900 varas square. After thus fixing the lines and corners of odd numbered sections, he began at the corners of such sections so established by him and established the adjoining even numbered sections, giving each sufficient distances to include its own excess and the excess in the adjoining odd sections. A number of the sections which he thus resurveyed had as parts of their boundaries the outside lines of the block, which were marked upon the ground and easily identified. All such outside lines are now admittedly established. It appears undisputed that in doing this work Wadsworth fixed (for the first time) the west line of Section 25, putting its excess in Section 26, the west line of Section 27, putting its excess in Section 28, and the east line of Section 21 putting its excess in Section 22. He likewise fixed certain lines of other odd numbered sections, putting the excess in an adjoining even numbered section. He made corrected field notes of ten of the even numbered sections and returned same to the Land Office, together with a map showing, apparently, the new locations, dimensions and acreage of all sections in Block No. 44. A copy of said map is shown in the opinion of the Court of Civil Appeals.

Under date of November 21, 1912, he resurveyed Section 26. He began at the N. W. corner of Section 25, which corner appears to have been established 1900 varas west from the known east line of Block 44. His next call is as follows: "Thence S. 74° 40′ W at 35 vrs. pass gal. iron pipe 3″ dia., same being S. E. cor. Sur. No. 23 and S. W. cor. Sur. No. 24, 1934 vrs. to *gal. iron pipe 3″ dia.* for N. W. cor. of this sur. and *N. E. cor. of Sur. No. 27.*"

Under a date which appears as November 2, 1912, he surveyed Section 28. We are convinced that this is a mistake in date, and the same should be November 28, 1912, or a date just prior thereto. One of the chain carriers testified that Wadsworth began his work at the N. E. corner of the block and that he surveyed Section 2 at that time. The field notes of this section are dated November 20, 1912. The chain carrier further testified that the work was done within a week or one or two days longer than a week. The field notes of Section 26 are dated November 21. The field notes of Section 34 are dated November 26, The field notes of Sections 8, 18 and 20 are dated November 27. The field notes of Section 22 are dated November 28. As the field notes of Section 22 and of Section 28 mutually

call for each other, we think it appears with reasonable certainty that they were made the same day.

The field notes of Section 28 contain the following call: "Beginning at N. W. cor. of Sur. No. 27 gal. iron pipe set in S. Bdy. line of Sur. No. 22 this blk. Tence S. 74° 40' W. at 37 vrs. pass gal. iron pipe 3" dia. same being S. E. cor. of Sur. No. 21 and S. W. cor. of Sur. No. 22."

As stated above, Section 22 was surveyed November 28, 1912, which was seven days after the survey of Section 26. It began at the N. E. corner of Section 21, in the south line of Section 16. It then called to pass the S. E. corner of Section 16 and S. W. corner of Section 15 and at 1938 varas called for its N. E. corner to be at the N. W. corner of Section 23. The next two calls are as follows:

"Thence S. 15° 20' E 1900 vrs. along with W. bdy. line of said Sur. No. 23 to gal. iron pipe for S. E. cor. of this Sur. and N. E. cor. of Sur. No. 27 this Blk. Thence S. 74° 40' W. along with N. bdy. line of said Sur. No. 27 at 1901 vrs. pass gal. iron pipe 3" dia., same being N. W. cor. of Sur. No. 27 and N. E. cor. of Sur. No. 28 this blk., 1938 vrs. to gal. iron pipe 3" dia. for S. W. cor. of this Sur. and S. E. cor. of Sur. No. 21 this blk."

As thus resurveyed said Section 22 purported to contain 652 1/4 acres. The field notes having been returned to the Land Office, Buchanan paid for the land upon the basis of the acreage indicated, and thereupon patent was issued to him as assignee. The general description in the patent was as follows:

"Six Hundred Fifty two and 1/4 (652-1/4) acres of land situated and described as follows: In Ector County, known as Sec. No. 22, Blk. 44, Tsp. 1S, T. & P. Ry. Co. Cert. No. 4352, about 13 miles N. W. from Odessa. Said land having been purchased and fully paid for in accordance with an Act approved April 19, 1901."

This was followed by a specific description containing the two calls above set out.

We produce at this point part of a plat attached to brief of defendants, except that we have taken the privilege of putting thereon the letters A B C & D. We hope in this way to give a clearer understanding of the real situation and the contention upon which this suit is based.

It seems to be conceded by all parties that if Section 27, as patented, be considered as being 1900 varas square, and be located by course and distance from outside lines of the block, its N. E. corner will be at the point indicated by the letter B. There appears to be a corner at that point marked with a small pipe set in concrete, but it is not clear as to when such corner

was established. Under the same assumption the N. W. corner of Section 27 will be located at the point marked C. It is undisputed that a galvanized iron pipe about 3 1/2 inches in diameter is found in the ground at the point marked A. This pipe is about 100 feet northwest from the corner marked at the point B. There is no proof as to who put the pipe at point C, but one of the surveyors "took it to be" a pipe set in the ground by the surveyor Wadsworth. It is located near what was at one time a cattle guard.

Briefly, the contention of the State and of defendant Outlaw may be thus stated: That Wadsworth in surveying Section 22, when running from its N. E. corner along the west line of section 23, stopped at the point A and set the 3 1/2 inches galvanized pipe there for the S. E. corner of said Section 22. That he mistakenly called this to be the N. E. corner of Section 27. That he then ran a line from the point A to point D, which is a short distance from the N. W. corner of Section 27 indicated by the point C, that in running this line he mistakenly called it to be the north line of Section 27, and mistakenly called for the N. W. corner of Section 27 and the N. E. corner of Section 28.

The land in controversy is the long narrow strip indicated by letters A B C and D. It is the contention of the State and defendant Outlaw that it was, prior to the resurvey, a part of Section 22; that as the surveyor in making the resurvey actually stopped at the point A, then ran to the point D, this became the south boundary line of the survey, leaving the narrow strip vacant land; that as Buchanan accepted a patent based upon this resurvey, under the rule announced in Holmes v. Yates, 122 Texas 428, 61 S. W. (2d) 771, and Miller v. Yates, 122 Texas 435, 61 S. W. (2d) 767, he could not claim title to said strip.

The Court of Civil Appeals reversed and remanded the case, holding that the evidence was sufficient to raise an issue of fact that the iron pipe found at point A was placed there by Wadsworth in resurveying Section 22, thus fixing with certainty his footsteps, and that if a jury so found, the strip of land in controversy would be shown to be a part of the public domain, subject to the Outlaw permit.

Iron stakes, such as were called for by Wadsworth, were found at several different places. While there may be an inference that Wadsworth placed the iron pipe at point A, yet we have concluded that as a matter of law there were common corners and a common line between Section 22 and Section 27,

and the only controversy (if any) which could exist is as to the true location of said corners and line.

As shown above, Wadsworth resurveyed Section 26 on November 21, 1912, having previously surveyed Section 2, some four miles to the north, the day before. In surveying Section 26 he made a common corner for its N. W. corner and the N. E. corner of Section 27, marking it with a "galvanized iron pipe 3 inches in diameter." In resurveying Section 28 (which we think must have necessarily been done on Nov. 28, 1912) he called to begin at the N. W. corner of Section 27, "galvanized iron pipe set in south boundary line of Survey No. 22." He then called to go westwardly 37 varas passing a galvanized iron pipe 3 inches in diameter "being S. E. corner of Section 21 and S. W. corner of Section 22." He thus fixed the N. E. corner of Section 28 in the south line of Section 22 and tied the north line of Section 28 to the south line of Section 22. To our minds this indicates almost conclusively that Section 28 and Section 22 were surveyed the same day, and were the last sections surveyed.

Having in mind, then, that Wadsworth had established the N. E. corner of Section 27 only seven days before surveying Section 22, marking said corner with a three inch galvanized pipe, and on the same day he resurveyed Section No. 22 had fixed the N. E. corner of Section 28 in the south line of Section 22, we come to note the call in the field notes of Section 22 which is of vital importance in this case. After calls which carried him to the N. E. corner of Section 22 and the N. W. corner of Section 23, the surveyor made the following call: "Thence S. 15° 20' E. 1900 varas along with the west boundary line of said Survey No. 23 *to* galvanized iron pipe *for* N. E. corner of this survey and *N. E. corner of Survey No. 27.*" We think the language used is particularly significant. He does not indicate that he set an iron stake to establish the S. E. corner of Section 22, but he says that he ran 1900 varas *to* a galvanized iron pipe for S. E. corner of Section 22 and N. E. corner of Section 27. This language clearly indicates, to our minds, that the galvanized iron pipe which he called for was the one already set by him some days before as the N. W. corner of Section 26 and the N. E. corner of Section 27. Being perfectly familiar with the situation, in what appears to be an open prairie country, it occurs to us as wholly unreasonable to say that he would have set another galvanized iron pipe in less than 100 feet of one set by him only seven days before, and would have called for it as being the same stake which he had previously set. It will be noted that in the field notes of Section 22 he does not call

for a three inch galvanized pipe, as he had done at many corners, but his language is such as to clearly infer that the galvanized iron pipe which he mentioned was the one set for the N. E. corner of Section No. 27; otherwise he would have described it by referring to its dimension. Then follows the call as follows: "Thence S. 74° 40' W. *along with N. bdy. line of said Sur. No. 27*, 1901 vrs. pass gal. pipe 3" in dia. same *being N. W. cor. of Sur. No. 27* and *N. E. cor. of Sur. No. 28*, this blk., 1938 vrs. to gal. iron pipe 3" in dia. to S. W. cor. of this sur. and S. E. cor. of Sur. No. 21."

■ If we are correct in the inference that Section 28 was surveyed the same day as Section 22, or some few days before, it appears wholly unreasonable to us that the surveyor did not actually go to the N. W. corner of Section 27 and the N. E. corner of Section 28, which had recently been marked with a 3 inch galvanized iron pipe. There does not appear to be a stake of any kind at point D. It is our opinion that the plain interpretation of the field notes made by the surveyor leads to the inevitable conclusion that these surveys were all tied together, and that Section 22 and Section 27 have common corners and a common line. It thus appeared on the map which Wadsworth made. It is not necessary to resort to rules of construction, as the field notes speak for themselves. It seems to us unquestionable that if any doubt whatever arises it is as to the location of this common line. The evidence might possibly raise an issue of fact in that regard, but we believe it immaterial even if it does.

■ It must be remembered that when Wadsworth did this work none of these surveys had actually been surveyed on the ground. They may have had *theoretical* boundaries, but did not have any actual *official* boundaries. This resurvey was made under the provisions of Articles 5396 and 5397 of the Revised Statutes of 1911, which provided as follows:

"Section 1. Be it enacted by the Legislature of the State of Texas: That all surveys and blocks of surveys heretofore made by virtue of valid alternate scrip be and the same are hereby declared to segregate from the mass of the public domain all the land embraced in said surveys, or blocks or surveys, as evidenced by the corners and lines of same, or by calls for natural or artificial objects, or the calls for the corners and boundaries of other surveys or by the maps and other records in the general land office.

"Section 2. That all excess in said surveys or blocks of sur-

veys are hereby donated and declared to belong to the public free school fund of the state; and it shall be the duty of the commissioner of the general land office to ascertain, by any and all means practicable, the existence and extent of such excesses, and to provide for and direct such surveys, or corrected surveys, as may be necessary for this purpose: Provided, That where such surveys were made in blocks of two or more surveys, said respective surveys shall remain on the ground consecutively as placed therein, as shown by the maps, sketches, and field notes originally returned to the general land office: Provided, That the person who has already purchased, or who may hereafter purchase from the state, the particular section to which surplus shall by such resurvey be made contiguous, shall have the prior right for the period of six months after such resurvey shall have been made, in which to purchase such excess on the same terms on which such purchaser has already bought or may buy."

The undisputed purpose of the resurvey was to determine the excess in the block of surveys, and to allocate same to the even numbered surveys, as a part of the public free school fund. To do this two things were absolutely necessary: First. To establish officially the lines and corners of the even numbered surveys and to include in them the excess acreage allowable to each of them. Second. This necessarily included the establishing *officially* of the lines of the adjoining odd numbered surveys, because it was imperative that they "remain on the ground consecutively." This implies, we think, that the surveys should remain adjoining each other, numbered consecutively, and further implies that if the excess be allocated as was done in this instance, that the boundaries of the odd sections be officially established so as to exclude the excess therefrom and so as to allocate all excess to even sections. That appears exactly what the surveyor intended to do in this instance.

■ Buchanan had purchased both of these surveys in reliance upon the map which showed them to be adjoining. Both of the surveys were included in his pasture. Proof of occupancy had been made as provided by law. Certainly, equity and fairness required that they be surveyed so that no vacancy would be left between them. The very statute under which the survey was made was exhaustively discussed in the case of Wright v. Gale, 104 Texas 450, 140 S. W. 91. In the course of that opinion the court said:

"There being no positive or definite direction in the Act how this right of separation may be exercised by the commissioner,

when the necessity arises, the court is called upon to construe the Act and determine how such authority may be exercised. In the absence of any provision directing how to proceed in making the segregation of the excess found to exist we hold the commissioner, in the exercise of the authority confided in him by the Act, must be governed *by those rules of justice and equity* that control and govern the acts of individuals in dealing with one another in ordinary transactions, as recognized and promulgated by our courts of equity. Because the State is interested in a matter and the public free school fund involved is no good reason why common sense, justice and equity should be discarded in construing the meaning and purpose of a legislative Act."

Further in the opinion it was said:

"The moving purpose of the Act seems to have been to secure to the free school fund the benefit of any excess of land that might be found to exist in any survey of the public lands previously surveyed, and not to *discommode, injure or in any manner impair the right of any purchaser of any of these public lands*. This is indicated from the fact that the Act gives the original purchaser the preference right to purchase any such excess upon the same terms for which the survey was originally purchased, and to have six months in which to make the purchase after the commissioner has ascertained the existence of such excess."

It follows, we think, that when the surveyor established the official N. W. corner of Section 26, which he also marked as the N. E. corner of Section 27, such common corner necessarily became the official corner of Section 27. Likewise, when he established the official N. E. corner of Section 28, and marked it as the N. W. corner of Section 27, such corner necessarily became the official corner of Section 27. This official corner is called to be in the south line of Section 22. It follows also that when he officially established the south line of Section 22, declaring it to be the North line of Section 27, it necessarily became the official line of Section 27. So it occurs to us as practically unimportant whether this line be from the point A to point D, or from point B to point C. If the official N. W. corner of Section 26 at the point A, and the official N. E. corner of Section 28 be at point D, then undoubtedly the north line of Section 27 extends from one of these points to the other. If this be true the State has no right to complain. It is un-

disputed that the purpose of Wadsworth was to take *all* excess out of Section 27 and to put it into Section 28. There does not appear to be any contention that if the north line of Section 27 be from point A to point D there will be any excess in Section 27. Besides, this is not an attempt to recover an excess in a survey, but an effort to tear apart surveys shown upon the official plat of the surveyor to adjoin each other and to establish a vacancy between such surveys. See State v. Coleman-Fulton Pasture Co., 230 S. W. 850.

On the other hand, if, as the parties appear to insist, the *official* north line of Section 27 is from the point B to the point C, then we think it follows as a matter of law that the bundaries of Section 22 were extended to this line, and the land in dispute is a part of Section 22. In other words, we mean to hold that the iron pipe called for in the field notes of Section 22 was the same iron pipe that was set by Wadsworth to mark the N. W. corner of Section 26 and the N. E. corner of Section 27. If this corner be at the point B, then the S. E. corner of Section 22 is at that point, and the iron pipe at point A is entitled to no consideration, as it is not called for in the field notes of Section 22. If, on the other hand, Wadsworth put the N. E. corner of Section 27 at the point A, he certainly had authority under the statute to do so, and that became the official corner of Section 27; binding on all parties including the State.

A significant circumstance, in addition to what has been said, is this: There is proof to the effect that if the south line of Section 22 is located from the point B to the point C, its total acreage, including the land in controversy, is only 649 3/4 acres. Wadsworth reported the acreage as 652 1/4 acres, and Buchanan paid for that amount. His application to purchase certainly included the excess. Willoughby v. Long, 96 Texas 194. His patent calls for 652 1/4 acres, and designates it as *Sec. 22, Blk. 44.*

Manifestly, all the excess acreage in Section 22 was intended to be patented to Buchanan. It was paid for by him. He accepted the patent in reliance on the calls in the field notes to the effect that its S. E. corner and its S. W. corner were the same as the corner of Section 27, and that its south line was coincident with the north line of Section 27. He also accepted the patent in reliance upon the assurance that it included all the excess to which the State was entitled, and that it adjoined his section on the south, as the field notes and the plat of the surveyor unquestionably showed. While we do not hold that the State is estopped in such a situation, yet we do hold that under such circumstances the rule announced in the cases of Holmes

v. Yates and Miller v. Yates, supra, should have no application. In this connection we call attention to the equitable rule announced in the case of Findlay v. State, 238 S. W. 956, 973, affirmed in 113 Texas 30, 250 S. W. 651. In that opinion it is said:

"It is evident that the state intended to convey these lands in solid bodies, without any vacancy between any of the surveys. The field notes of the various leagues call for each other, and the maps prepared by the state's surveyors, to which bidders looked, showed that the lines of the surveys were coterminous. It was the intention of the state to so grant the surveys, and of the contractors to so receive them.

"By reason of the fact that several surveyors were doing the work in the field, corners were established on the ground in such manner as to leave vacancies, as stated in our original opinion herein, but in each instance these surveys called for each other. These vacancies have been sold by the Capitol Company, and the parties purchasing them have for many years been in possession of the same, and have made improvements thereon, in ignorance of the mistakes of the state's surveyors, which created these vacancies. We think, under these circumstances, the equitable title to these vacancies has been in the Capitol Company ever since the capitol building was completed. *The patents should have embraced these vacancies, and equity regards that as having been done which ought to have been done.*"

We do not hold this principle as controlling in this case (as it is not necessary to do so), but call attention to same in order to show that equitable considerations, as well as the facts of the case, strongly support the conclusion that Section 22, as patented, actually adjoined Section 27, and the land in controversy is no part of the public domain.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the district court is affirmed.

Opinion adopted by the Supreme Court April 2, 1941.

Rehearing overruled May 7, 1941.