Luther LYNN and the State of Texas,
Appellants,

v.

Fred M. MANNING et al., Appellees.

No. 10435.

Court of Civil Appeals of Texas. Austin.

Dec. 5, 1956.

Rehearing Denied Jan. 16, 1957.

Sedberry & Williams, San Angelo, John Ben Shepperd, Atty. Gen., J. Arthur Sandlin, Asst. Atty. Gen., for appellants.

Kilgore & Kilgore, Dallas, Vinson, Elkins, Weems & Searls, Houston, for appellees.

HUGHES, Justice.

This suit was brought by appellant, Luther Lynn, who alleged that he had discovered a tract of vacant unsurveyed school land situated in Runnels County and that he had complied with all requirements of Article 5421c, Vernon's Ann.Civ. St., entitling him to issuance of an oil and gas lease thereon but that his application therefor was rejected by the Commissioner of the General Land Office of Texas upon his finding that no vacancy existed. The purpose of the suit was to establish the vacancy and Lynn's preference right, under the statute, to an oil and gas lease.

The Land Commissioner and Attorney General of Texas were served with process in the cause and the Attorney General on behalf of the State filed an answer and cross action in which recovery of the land described in Lynn's suit and damages thereto were sought. The damage issues

were severed before trial and this appeal involves only the vacancy issue.

In a nonjury trial judgment was rendered denying existance of a vacancy. The State and Lynn have appealed.

Many parties were made defendants in the Trial Court including Mrs. Margaret Alice McNay owner of the surface and an undivided one half of the minerals in the land constituting the McNay ranch on which the vacancy is sought to be established. No brief in her behalf has been filed in this Court.

A brief has been filed by appellees, Fred M. Manning, Inc., Beloil Corporation, Ltd., Fred Goodstein, O. G. Gordon, Fred M. Manning, Malco Refineries, Inc., Clarence W. Sanders, Wunderlich Contracting Company and John H. Wilson who own an oil and gas lease on a large portion of the McNay ranch including the alleged vacant area. This brief has been adopted by royalty owners Mrs. Thelma Irby et vir., George P. Murrin, Wright Morrow, individually and as trustee, John F. Deifell, Margaret Schmid Jeremiah, John Richard Schmid, Virginia Dufee Jones, Arthur T. McDonald, May Daily and Reilly Christine Hall McDonald, individually and as agent.

The Trial Court made comprehensive findings of fact which appellees adopt and regarding which appellants say "There is no material dispute as to the actual controlling facts. The controversy revolves around the legal inferences and conclusions to be drawn from the undisputed evidence; and the rules relating to the construction of surveys that should be applied in the light of the undisputed evidence."

In view of these statements by the parties we copy and adopt as our own the skillfully and concisely drawn findings of fact made by the Trial Court and while, for completeness, we copy the findings without deletion as well as his conclusions of law we do not, except as may be hereinafter indicated, adopt any conclusions of law therein contained.

"Findings of Fact

"1. On July 7, 1838, the Board of Land Commissioners of Bexar County, Texas, issued two certificates as follows:

"A. No. 575 to William Richardson, Assignee of Maria Candida Zuniga for one league of land.

"B. No. 579 to William Richardson, Assignee of Jose Maria Garcia for one-third league of land.

"These certificates were filed with the District Surveyor of the Bexar Land District February 17, 1853, by R. A. Howard. At the time of the filing of the certificates the record title to both certificates stood in the name of Richard A. Howard, Samuel H. Luckie, and Lydia McL. Johnson.

"2. Conveyances of record in Runnels County, Texas, contain recitals to the effect that R. A. Howard, owned a locative interest in the following land certificates at the time of their filing with the District Surveyor, towit:

"A. Toby Scrip Nos. 117, 118, 119 & 120, for 640 acres each, issued by Thomas Toby to Samuel M. Williams and by him assigned to Gray Carroll.

"B. Certificate No. 258, 2nd Class, issued in Bexar County, Texas, to S. H. Luckie, dated October 1, 1847, calling for 640 acres of land.

"The certificates described in paragraph A above were filed with the District Surveyor of the Bexar Land District on October 11, 1852, by R. A. Howard. They were accompanied by letter from R. A. Howard to the District Surveyor requesting that 'two equal surveys' be surveyed under each certificate to be located 'so that the creek shall be near the center of the survey.' The letter referred to certain requests for surveys theretofore made by S. A.

Maverick. S. A. Maverick had requested that his surveys be located on Oak Creek, a tributary of the Colorado River, on Lawn (Long) Creek and Valley Creek. In his request R. A. Howard requested that his surveys be made upon a creek running between Lawn and Oak Creek which is now identified as Salt Creek, a tributary of Oak Creek.

Lawn or Long Creek is now known as Fish Creek.

"3. Some time prior to March 25, 1853, J. G. McDonald, Deputy Surveyor of the Bexar Land District, went on the ground and made a survey from which he prepared field notes of the following surveys made upon the following certificates, towit:

| "Survey Number | Name | Date of Field Notes | Cert. No. | Recited Acreage |
|---|---|---|---|---|
| 283 | Gray Carroll | 3–25–1853 | 117—Toby Scrip | 320 |
| 284 | Gray Carroll | 3–25–1853 | 117—Toby Scrip | 320 |
| 285 | Gray Carroll | 3–25–1853 | 119—Toby Scrip | 320 |
| 286 | Gray Carroll | 3–25–1853 | 119—Toby Scrip | 320 |
| 287 | Gray Carroll | 3–25–1853 | 118—Toby Scrip | 320 |
| 288 | Samuel H. Luckie | 3–25–1853 | 258 | 640 |
| 289 | Gray Carroll | 3–25–1853 | 118—Toby Scrip | 320 |
| 290 | Gray Carroll | 3–25–1853 | 120—Toby Scrip | 320 |
| 291 | Gray Carroll | 3–25–1853 | 120—Toby Scrip | 320 |
| 292 | William Richardson, Assignee of Maria Garcia | 3–28–1853 | 579 | ⅓ League |
| 298 | William Richardson, Assignee of Maria Candida Zuniga | 3–26–1853 | 575 | 1 League |

"4. During the same period, and as a part of the same work, J. G. McDonald made a survey on the ground from which he prepared field notes for S. A. Maverick covering a number of surveys made upon the following certificates, to-wit:

| "Survey Number | Name | Date of Field Notes | Cert. No. | Recited Acreage |
|---|---|---|---|---|
| 293 | James Jefferis | 3–26–1853 | Bounty Warrant No. 604 | 640 |
| 294 | Edward Taylor | 3–26–1853 | Bounty Warrant No. 980 | 480 |
| 295 | Edward Taylor | 3–26–1853 | Bounty Warrant No. 980 | 480 |
| 296 | Charles Colericke | 3–26–1853 | Bounty Warrant No. 612 | 480 |
| 297 | A. Maverick, Assignee of Pedro Martinez | 3–27–1853 | Decree of Dist. Court of Bexar County | ⅓ League |

"The Court finds that in making his survey mentioned in Paragraphs 3 & 4 McDonald was actually on the ground at all points where his field notes called for bearings to natural objects. The Court does not consider it necessary to find, and consequently makes no finding as to whether or not McDonald was on the ground at other points called for in his field notes.

"5. From the field notes and the sketches accompanying the same it is possible to

plat McDonald's work into a working sketch which shows the relationship of the various surveys according to his field notes. Such a working sketch accompanies these Findings of Fact.

"Examination of the field notes shows that the various surveys listed in Paragraphs 3 and 4 were made by J. G. McDonald as one piece of work, the surveys being constructed one upon the other according to the following pattern:

"284 was constructed upon 283;
285 was constructed upon 284;
286 was constructed upon 285;
287 was constructed upon 286;
288 was constructed upon 287;
289 was constructed upon 287;
290 was constructed upon 289;
291 was constructed upon 290;
292 was constructed upon 294;
293 was constructed upon 292;
294 was constructed upon 293;
295 was constructed upon 294;
296 was constructed upon 295;
297 was constructed upon 296;
298 was constructed upon 289.

"Sketches accompanying the field notes of each survey show that McDonald intended that the surveys adjoin in the following manner:

"That the South line of Survey 284 should adjoin the North line of Survey 283.

"That the South line of Survey 285 should adjoin the North line of Survey 284.

"That the West line of Survey 286 should be coincident with the East line of Survey 285.

"That the West line of Survey 287 should adjoin the East line of Survey 286.

"That the West line of Survey 288 should be coincident with the East line of Survey 287.

"That the South line of Survey 289 should adjoin the North line of Survey 287.

"That the West line of Survey 290 should be coincident with the East line of Survey 289.

"That the West line of Survey 291 should be coincident with the East line of Survey 290.

"That the East line of Survey 292 should adjoin the West line of Survey 294, and that the North line of Survey 292 should adjoin the most eastern South line of Survey 298.

"That the West line of Survey 293 should adjoin the East line of Survey 292, and the North line of Survey 293 should adjoin the South line of Survey 294.

"That the North line of Survey 294 should adjoin the South line of Survey 295.

"That the North line of Survey 295 should adjoin the South line of Survey 296.

"That the North line of Survey 296 should adjoin the South line of Survey 297.

"That the South line of Survey 298 should adjoin the North line of Survey 290. That the most southern East line of Survey 298 should adjoin the West line of Survey 292, and that the most Eastern South line of Survey 298 should adjoin the North line of Survey 292.

"The surveys appear to have been constructed in their particular form for the purpose of making the best use of the available water in accordance with the requests made by R. A. Howard and S. A. Maverick. In that connection, the sketches accompanying the field notes of Surveys 292 and 298 show that there is a creek intersecting the North line of Survey 292 and that the most eastern South line of Survey 298 and that a branch of Salt Creek cuts across the Northwest corner of Survey 292. The sketches accompanying the field notes of Survey 298 show that another branch of Salt Creek joins with the branch above mentioned in the eastern part of the southern segment of Survey 298 and flows down through the eastern part of

said southern segment in a southerly direction so that it crosses the South line of Survey 289 500 varas North 60 East from its Southwest corner.

"6. The field notes returned by J. G. McDonald for the Jose Maria Garcia Survey are as follows:

"Said Survey is No. 292, in Section 9, situated in Bexar County, on Salt Creek a branch of the Colorado River about 4½ miles N. 60 deg. E. of Fort Chadbourne beginning at a stake set for the West corner of Survey No. 294 from which a post oak 10 in. dia. bears North 13 varas a post oak 10 in. dia. bears S. 31 deg. W. 16 varas;

"Thence S. 60 deg. W. crossing two creeks 3232 varas to a stake and mound;

"Thence S. 30 deg. E. crossing a creek 2578 varas to a stake and mound;

"Thence N. 60 deg. E. crossing a creek 3232 varas to a stake from which a mesquite 6 in. dia. bears S. 64 deg. E. 39 varas;

"Thence N. 30 deg. W. 2578 varas to the place of beginning.

"The field notes for the Maria Candida Zuniga Survey returned by J. G. McDonald are as follows:

"Said Survey is No. 298, in Section No. 9, situated in Bexar County on Salt Creek a branch of the Colorado River about 5 miles North 35 deg. East of Fort Chadbourne beginning at a stake set for the North corner of Survey No. 289;

"Thence N. 60 deg. E. 500 varas a creek 1458 varas to a stake and mound;

"Thence N. 30 deg. W. 2578 varas to a stake and mound;

"Thence N. 60 deg. E. crossing two creeks 3232 varas to a stake from which a post oak 10 in. dia. bears North 13 varas a post oak 10 in. dia. bears S. 31 deg. W. 16 varas;

"Thence N. 30 deg. W. 2706 varas to Long Creek 3159 varas to Long Creek 3459 varas to Long Creek 4000 varas to a stake and mound;

"Thence S. 60 deg. W. 4312 varas to a stake and mound;

"Thence S. 30 deg. E. 1938 varas to a stake and mound;

"Thence S. 60 deg. W. 1938 varas to a stake and mound;

"Thence S. 30 deg. E. 2062 varas to a stake and mound;

"Thence N. 60 deg. E. 1560 to a stake and mound;

"Thence S. 30 deg. E. 2578 varas to the place of beginning.

"The M. C. Zuniga Survey 298 and the J. M. Garcia Survey 292 were each patented by the State of Texas to Samuel H. Luckie, Richard A. Howard and Lydia McL. Johnson on September 15, 1855, and September 14, 1855, respectively, the patent containing the field notes quoted in paragraph 6 above. Notations appearing on the back of the field notes of Surveys 283 to 298, inclusive, indicate that each of said Surveys has been patented by the State of Texas upon said field notes.

"Present day surveyors can find no markings on the ground by which any corner of the foregoing surveys, to-wit: the M. C. Zuniga Survey No. 298 and the J. M. Garcia Survey No. 292, may be located by their own field notes. None of the bearing trees called for in the field notes can presently be found and none of the stakes and mounds recited in the field notes can presently be found.

"The beginning corner of Jose Maria Garcia Survey 292, recited to be the West or Northwest corner of the Edward Taylor Survey 294, is shown by the field notes of the Garcia to be at a stake for the West corner of Survey 294, from which a Post Oak 10 inches in diameter bears North 13 varas; a Post Oak 10 inches in diameter bears South 31 deg. West 16 varas; said Post Oak bearing trees being gone; said corner can be located by construction from

the Southwest and Northeast corners of said Survey 294 in the following manner:

"The Live Oak bearing trees recited in the field notes of Survey 294 at the Northeast corner thereof can presently be found and are sufficiently identified, and the Northeast corner of said Survey may be located on the ground by course and distance from those bearing trees.

"The Cedar bearing trees at the Southwest corner of Survey 294 are presently located and sufficiently identified, and the Southwest corner of Survey 294 can be located by course and distance from those trees.

"Present day surveyors agree that McDonald's recited courses when tested by lines running between corners which are generally accepted to be original corners established by J. G. McDonald on the ground show a variation of 50 to 53 minutes East of true North as established by the U. S. Coast & Geodetic Survey in the area. Present day surveyors agree that the best construction of the East line of the Jose Maria Garcia and the Eastermost East line of the M. C. Zuniga Surveys in order to conform as nearly as possible to McDonald's calls require that that line be run on a course of North 29 deg. 10′ West (U.S.C. & G.S.).

"Accordingly, the Northwest corner of Survey 294 can be established at the point of intersection of two lines, one of which runs North 29 deg. 10′ West (U.S.C. & G.S.) from the Cedar corner (Southwest corner of Survey 294), and the other of which runs South 60 deg. 50′ West (U.S.C. & G.S.) from the Live Oak corner (Northeast corner of Survey 294.) This point as established on the ground is also the most eastern Southeast corner of the M. C. Zuniga Survey 298, the Northeast corner of the J. M. Garcia Survey 292, and the Southwest corner of the Edward Taylor Survey 295, all of which corners the Court finds to be common corners of the four surveys.

"For the Northeast corner of Survey 289, Gray Carroll, the Court has accepted a rock mound with a ¾″ iron pipe placed by H. L. George at a point which is 500 varas from Salt Creek and which, according to George's testimony, is 699 varas North 60 East (George's course) and 1344 varas North 30 West (George's course) from a rock mound which is generally accepted by present day surveyors as the Northwest corner of the Gray Carroll Survey 287, said rock mound being 130 varas North 66 East from a rocky bluff called for in the McDonald field notes of Survey 287. The 'Rocky Bluff', or 'Stone Bluff', called for by McDonald in his field notes as a bearing to the Northwest corner of Survey 287, is a prominent and conspicuous land mark; and is depicted on Plaintiff's Exhibit No. 12 herein; same being a photograph of said Bluff.

"7. There is an excess distance of 632 varas in the eastings (on an approximate course of North 60 deg. 50′ East, U.S.C. & G.S.) between the Southwest corner of the M. C. Zuniga Survey as established on the ground in the manner above set forth and the most eastern Southeast corner of the M. C. Zuniga Survey (which is also the Northeast corner of the J. M. Garcia Survey 292) as established on the ground as above set forth. The Court finds that this excess distance is the result of an error made by J. G. McDonald in chaining the distance on the ground and that J. G. McDonald actually ran a connection between the Southwest corner of the Zuniga Survey and the most eastern Southeast corner of the Zuniga Survey, although the exact course of that connection cannot be established at this time. It is impossible to tell the exact place that the error was made although the Court concludes from all the evidence that it occurred somewhere between the Salt Creek crossing on the South line of the Zuniga Survey and the East line of the Garcia and Zuniga Surveys.

"8. It is the contention of the Plaintiff and the State of Texas that the only proper way to construct the J. M. Garcia Survey is by course and distance from its be-

ginning corner and that the Southern segment of the M. C. Zuniga Survey must be constructed by course and distance from its beginning or Southwest corner, so that the West line of the J. M. Garcia Survey will be 3232 varas South 60 West from the East line of said Survey, and the most southern East line of the M. C. Zuniga Survey would be 1458 varas North 60 East from the most southern West line of said survey, leaving a vacancy 632 varas wide between the West line of Survey 292 and the most southern East line of Survey 298. Meandering of Salt Creek and its various branches by present day surveyors shows that if a vacancy exists at the place contended for by the Plaintiff and the State of Texas, the vacancy would take up a large portion of the available water from Salt Creek in the area.

"9. The Court finds that J. G. McDonald intended the West line of the J. M. Garcia Survey 292 to be a common line with the most southern East line of the M. C. Zuniga Survey 298.

## "Conclusions of Law

"1. Due to the destruction of bearings called for by McDonald in his original field notes, it is impossible to locate the J. M. Garcia and M. C. Zuniga Surveys on the ground by the use of their field notes alone without assistance from the field notes of adjoining surveys some of which are called for in McDonald's field notes for the Zuniga and Garcia Surveys.

"2. Resort to field notes of adjoining surveys for the purpose of locating the lines of the Zuniga and Garcia Surveys is both necessary and proper.

"3. Resorting to the field notes of adjoining surveys, including surveys called for in McDonald's field notes to Surveys 292 and 298, it is possible to locate the outside lines and corners of the J. M. Garcia and M. C. Zuniga Surveys on the ground and when such lines and corners are so located, there is an excess distance of 632 varas between the East line of the J. M. Garcia Survey and the most southern West line of the M. C. Zuniga Survey. The existence of this excess distance constitutes a latent ambiguity which does not appear from an examination of McDonald's field notes but it appears only when an attempt is made to fix the field notes to the ground. The existence of this latent ambiguity makes it both necessary and proper for the Court to resort to extraneous evidence for the purpose of determining McDonald's intent as to the adjoinder of the West line of the J. M. Garcia Survey and the most southern East line of the M. C. Zuniga Survey.

"4. Examination of all available extraneous evidence shows that the act of survey of J. G. McDonald which resulted in his field notes for the J. M. Garcia Survey 292 and the M. C. Zuniga Survey 298, and for the Gray Carroll Surveys 283, 284, 285, 286, 287, 289, 290 and 291, and the S. H. Luckie Survey 288, was an act creating a system or block of surveys at the request of R. A. Howard, and the outside lines of that block are clearly established upon the ground and there can be no vacancies between surveys within the block. The West line of the southern segment of the Zuniga Survey is established and fixed by the Southwest corner of said Survey and the East line of the J. M. Garcia Survey is established and fixed by its adjoinder to Survey 294 which is definitely located on the ground by the Cedar corner. These two lines constitute outside lines of the R. A. Howard block and, consequently, there can be no vacancy at the point contended for by the Plaintiff and the State of Texas.

"5. Regardless of the block or system construction of McDonald's work, it is obvious from all available evidence that McDonald intended the West line of the Garcia to be common with the most southern East line of the Zuniga, so that there could be no vacancy between the two surveys as contended for by the Plaintiff and the State of Texas.

"6. The pleadings of the parties in this case do not call upon the Court to determine

the exact location on the ground of the common line between the M. C. Zuniga Survey and the J. M. Garcia Survey.

"7. There being no vacancy at the point alleged in the Plaintiff's petition and the cross action of the State of Texas, the judgment of the Court should be that the Plaintiff and the State of Texas take nothing against the Defendants."

Inserted below is a portion of a plat introduced in evidence by appellants and prepared by their witness, H. L. George, Licensed State Land Surveyor.

Appellees have prepared and appended to their brief a working sketch of surveys by J. G. McDonald in northwest Runnels County dated March, 1853.

This sketch is very similar to the George plat shown above except that it shows the Garcia west line and the lower east line of the Zuniga to be a common line and it depicts all the surveys listed in paragraphs 3 and 4 of the Findings of Fact.

From the conclusions of the law made by the Trial Court and the briefs of the parties it is made to appear that the judgment

below was based upon one or the other or both of these methods of constructing the Garcia and Zuniga surveys as related to the area in dispute:

1. By considering the work of J. G. McDonald done in March, 1853, in northwest Runnels County as a block or system of surveys the outside lines of which may be located on the ground and precluding the existence of a vacancy between lines of interior surveys under the rule found in Gulf Oil Corporation v. Outlaw, Tex.Com. App., 136 Tex. 281, 150 S.W.2d 777 and in many other cases.

2. That under the evidence McDonald's "act of survey" shows an intention that the west line of the Garcia should be common with the most southern east line of the Zuniga.

We will discuss the second method first.

In Blackwell v. Coleman County, 94 Tex. 216, 59 S.W. 530, we find the following rules for ascertaining the intent of a surveyor where there are inconsistent calls in the grant:

"In determining the location of the land in such cases, the courts seek to ascertain the true intention of the parties concerned in the survey. But the intention referred to is not that which exists only in the mind of the surveyor. It is defined as that which may 'be gathered from the language of the grant' or as 'the intention apparent on the face of the grant' (Hubert v. Bartlett, 9 Tex. 104), or 'the legal meaning of the language of the patent when considered in the light shed upon it by the acts constituting the survey.' Robertson v. Mosson, 26 Tex. 251; Robinson v. Doss, 53 Tex. 507; Brown v. Bedinger, 72 Tex. 245, [247] 10 S.W. 90; Richardson v. Powell, 83 Tex. 591, 19 S.W. 262. When reference is made in the decisions to the intention of the surveyor, the purpose deduced from what he did in making the survey

and description of the land is meant, and not one which has not found expression in his acts. Grants are issued by the state and accepted by the grantees upon the acts done by the surveyor in identifying and describing the lands, and the rights of both are to be determined by the legal effect of those acts, and not by intentions which can not be deduced from a construction of the descriptions in the grant, with the aid of the facts constituting the surveys upon which they are based."

Similarly in Findlay v. State, Tex.Civ. App., 238 S.W. 956, 971, affirmed 113 Tex. 30, 250 S.W. 651, Judge Jenkins for this Court said:

"Such intention will be indicated, not by what the surveyor intended to do and thought he had done, but by what, in fact, he did do. In other words, where did he actually locate the lines and corners of the survey made by him? And not simply where did he intend to locate the same with reference to some other survey? This is to be done by ascertaining as best we can, which of the contradictory calls was inserted by mistake, and by rejecting such mistaken call."

Added to these classic statements is the admonition of the late Justice Smedley in Weatherly v. Jackson, Tex.Com.App., 123 Tex. 213, 71 S.W.2d 259, 264, that "* * * the land which is segregated from the public domain by a survey is the land which is surveyed and which is described in the field notes, and is not the land which ought to have been surveyed. * * *"

The two surveys primarily involved, Garcia and Zuniga, have established and concededly correct beginning corners. The Garcia has for its beginning or northeast corner the northwest corner of Survey 294, located in the manner described in Finding of Fact No. 6, supra. The first field note call of the Garcia is "S. 60 deg. W. cross-

ing two creeks 3232 varas to stake and mound." No stake or mound being found and there being no call for adjoinder to any other survey the call for course and distance must be obeyed. This then places the northwest corner of the Garcia S. 60 deg. W. 3232 varas from its northeast corner.

The next field note call is "Thence S. 30 deg. E. crossing a creek 2578 varas to a stake and mound," and the third call, for its south line is "Thence N. 60 deg. E. crossing a creek 3232 varas to a stake from which a mesquite 6 in. dia. bears S. 64 deg. E. 39 varas." This south line of the Garcia is parallel with its north line and since it calls neither for adjoinder to adjacent surveys nor for monuments which can be found it is entitled to its field note distance of 3232 varas. It would be located in a line from a point in the west line of Survey 293 S. 60 deg. W. to the northeast corner of Survey 289.

The last field note call of the Garcia is "Thence N. 30 deg. W. 2578 to the place of beginning." The east and west lines of the Garcia are parallel and fall into place by connecting the respective corners established as above indicated. The east and west lines are reduced in length from the field note call, 2578, to 2548.6 as a result of locating the south line in the manner stated above, thus avoiding an apparent conflict with the surveys to the south. The acreage of the Garcia is thus reduced to 1458, a loss of about 18 acres.

We do not believe that, according to its field notes and the accepted locations of the surveys to the east and south and elementary rules of boundary, the Garcia could be located except as outlined above which is in accord with the testimony of the surveyor witness, H. L. George.

We turn now to the ground location of the Zuniga Survey No. 298.

The court and the parties have accepted the George location of the northeast corner of survey 289 (map above) which is the beginning corner of the Zuniga. From this corner the call is "Thence N. 60 E. 500 varas a creek 1458 varas to a stake and mound." The creek is reached at the approximate distance called for but in going the called distance of 1458 varas the point reached falls 621.76 [1] varas short of the west line of the Garcia. Since the Garcia was not called for there is no legal reason for not honoring the distance call unless this call is otherwise controlled by the establishment of the next corner of the Zuniga which we will now discuss.

■ The second call of the Zuniga is "Thence N. 30 deg. W. 2578 varas to a stake and mound" and the third and controversial call is "Thence N. 60 deg. E. crossing two creeks 3232 varas to a stake from which a post oak 10 in. dia. bears north 13 varas a post oak 10 in. dia. bears S. 31 deg. W. 16 varas." The called distance of the second line, 2578 varas, is reduced to 2548.6 varas for the reason that the courses called for control the calls for distance. 7 Tex. Jur. p. 190. A line projected from the most southerly south line of the Zuniga on the called for course N. 30 W. will intersect a line projected from the accepted most northerly southeast corner of the Zuniga on the called for course N. 60 deg. E., reversed, at a point 2548.6 varas rather than 2578 varas from the lower south line of the Zuniga.

The distance of 3232 varas given in the third call falls 621.75 varas short of reaching the accepted most northerly S. E. corner of the Zuniga. This discrepancy is undoubtedly due to the mistake of McDonald in calculating the ground distance between the known and accepted beginning corner of the Zuniga (S. W. corner) and its known and accepted most northerly S. E. corner, the ground distance between

1. The court found this distance to be 632 varas which is accounted for by the finding that McDonald's actual courses vary slightly from his called courses. The court adopted the actual courses, appellants the called courses.

these corners being 621.75 varas in excess of the field notes called distance. The total ground distance between these points is 5311.75 varas. The field note distance is 4690 varas.

█ There is no question but that McDonald intended to go to the northwest corner of Survey 294 regardless of the call for distance. The northwest corner of the survey is a stake with the same bearings as those given for the stake at the most northerly southeast corner of the Zuniga. It is apparent that his mistake was in the call for distance required to reach this corner. Such mistaken call is to be disregarded and the call for the stake with bearings respected. This construction is confirmed by consideration of the next call of the Zuniga which is N. 30 deg. W. 4000 varas to stake and mound and passing calls for three creeks the last of which is at 3459 varas, or 541 varas from the called distance of 4000 for corner. Placing this corner 541 varas on course from the last creek crossing as presently ascertained will make the overall length of this line 4023 varas.

The succeeding calls "Thence S. 60 deg. W. 4312 varas to a stake," "Thence S. 30 deg. E. 1938 varas to a stake and mound," "Thence S. 60 deg. W. 1938 varas to a stake and mound" and "Thence S. 30 deg. E. 2062 varas to a stake and mound" are established by course and distance alone.

The next call "Thence N. 60 deg. E. 1560 to a stake and mound" is controlled by the previously established most southerly southwest corner of the Zuniga. By running a line from this point on the field note course of N. 30 deg. W. to its intersection with a line running from the terminus of the last preceding call (most westerly S. W. corner Garcia) on its field note course of N. 60 deg. E. it is found that the actual length of this most northerly south line of the Zuniga is 938.25 varas as compared with the field note distance of 1560 varas, a shortage of 621.75 varas. This shortage is identical with the excess found between the most southerly southwest corner and the most easterly southeast corner of the Zuniga and in order for the field notes to close the excess of 621.75 varas placed in the third call of the Zuniga, most easterly south line, must be deducted from the return distance from its most westerly southwest corner to its most southerly west line.

The last call of the Zuniga "Thence S. 30 deg. E. 2578 varas to the place of beginning" is found to be 2571.6 varas only.

As so constructed the Zuniga Survey No. 298 contains 4,442.96 acres of land, 14½ acres more than the one league of land called for in its field notes.

The Trial Court having concluded that the west line of the Garcia and the most southern east line of the Zuniga were a common line the location of this line upon the ground was not found by it nor do appellees attempt to do so.

Below is a sketch which appears on the face of the original Zuniga field notes:

This is cited by appellees as proof of McDonald's intention that the Zuniga and Garcia should adjoin.[2]

We are also referred to the finding of the Trial Court that if this vacancy is

698

established it will include a large portion of the available waters from Salt Creek thus negating the request of R. A. Howard that his surveys be located upon such creek.

It is our opinion that the sketch and the matter of Salt Creek are descriptive rather than locative and that while they may be proof of how the area "ought to have been surveyed" they do not detract from nor affect the specific description of the land actually surveyed as contained in the field notes.

In addition to the above matters which McDonald may have had in mind was his duty to the State not to survey more land than the certificates called for. The field notes for the Zuniga which McDonald wrote call to enclose a fraction of an acre above the 4428.4 acres called for by the certificate.

■ Finally, we believe, the nonjoinder of the Zuniga with the west line of the Garcia was within the realm of McDonald's intent as shown by the failure of the one to call for the other as well as his failure to mark a common line. Our opinion is that there is no such actual joinder and that the Garcia and Zuniga surveys are located by their field notes as above outlined.

■ We turn now to the system or block theory advanced by appellees.

The Trial Court found that McDonald "actually ran a connection between the southwest corner of the Zuniga Survey and the most eastern southeast of the Zuniga Survey" and that between these points there is an excess distance of 632 varas in the eastings and that the excess "is the result of an error made by J. G. McDonald in chaining the distance on the ground."

The court concluded that:

"The West line of the southern segment of the Zuniga Survey is established and fixed by the Southwest corner of said Survey and the East line of the J. M. Garcia Survey is established and fixed by its adjoinder to Survey 294 which is definitely located on the ground by the Cedar corner. These two lines constitute outside lines of the R. A. Howard block and, consequently, there can be no vacancy at the point contended for by the Plaintiff and the State of Texas."

Although there is a presumption and perhaps some indirect evidence there is no direct evidence that McDonald chained the distance between the southwest corner of the Zuniga and its most eastern southeast corner. The furtherest point east which the Zuniga field notes show that he measured from the southwest corner is a creek 60 deg. E. 500 varas. Of course he knew the location of and actually ran a portion, at least, of the upper east line of the Zuniga but there is, as stated, no direct evidence that any actual measurement of the easting beyond the creek called for in Zuniga's most southerly south line.

Appellees point to excesses which appear in the north line of surveys 287 and 288 (adjoining surveys 289–291 on the south shown by plat above) amounting to 505 varas in actually running a called distance of 2850 varas.

In State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228, 232, the Court in speaking of an excess of 550 varas over a called distance of 3000 varas said "It is not reasonably to be assumed that he [surveyor] made a mistake of that magnitude in running his first line."

We do not believe it reasonably to be assumed that McDonald made an error of 621.75 (632) varas in chaining a called distance of 4690 varas. No mistake was made by McDonald in going 500 varas to Salt Creek in the first line of the Zuniga. The mistake then must have been made in running the remaining 4190 varas. 621.75 varas is about ⅓ of a mile. 4190 varas is about 2⅓ miles. It is simply incredible that an experienced surveyor, as McDonald was,

would make such an error. If we cannot make this assumption then we cannot assume that McDonald actually ran a traverse as found by the Trial Court. If such traverse was not run by McDonald then there is no basis for prorating the excessive distance in easting between the Zuniga and Garcia Surveys under the system or block theory.

Independently of this, however, we are of the opinion that the system or block theory cannot be applied to the facts of this case insofar as the Zuniga and Garcia surveys are concerned, for the reason that such surveys do not call for each other and the partition or division of a specific area of land is not involved.

As to this latter statement we quote from the testimony of appellees' surveyor witness, E. D. Brandt:

"Q. Now, there is a vacant area, is there not, inside of McDonald's surveys here? A. Oh, yes, he left some area out, that is correct.

"Q. There's a vacant area between the southern segment of the Zuniga and the Sosa, isn't there? A. Yes, sir.

"Q. And between the northern segment and the Sosa? A. Yes, sir.

"Q. And between the Gray Carroll 289 farther west? A. Yes, sir.

"Q. And farther south and to the west there is a vacant area? A. Yes, sir, at that time."

Appellees have discussed the following cases in their argument supporting the system or block theory: Clement v. Packer, 125 U.S. 309, 8 S.Ct. 907, 908, 31 L.Ed. 721; Johnson v. Knippa, Tex.Civ.App., San Antonio, 127 S.W. 905, writ dism.; Miller v. Meyer, Tex.Civ.App., Galveston, 190 S.W. 247; Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801, 104 S.W.2d 1; Welder v. Carroll, 29 Tex. 317, 318; Duval County Ranch Co. v. Rogers, Tex. Civ.App., San Antonio, 150 S.W.2d 880,

writ ref., and Standefer v. Vaughan, Tex. Civ.App., Amarillo, 219 S.W. 484.

Clement v. Packer defines or describes a block or system of surveys as follows:

"* * * a block of surveys,—a term which, under the Pennsylvania land system, means a series of surveys made by one surveyor at the same time upon warrants issued upon the same day, owned by the same person, dependent upon each other in succession, calling for each other, and returned to the land-office at the same time, and so located on the ground that the tracts each join the other side by side as a body."

Appellees state that the Texas cases which they cite show that this definition is too restrictive and that "the concept has much broader application in this State."

In Johnson v. Knippa the Court enunciated as sound law applicable to that case the following [127 S.W. 906]:

"'When the undisputed evidence shows that a block of surveys are made by the same surveyor as one piece of work, each of said surveys fronting on a stream, but only one corner on the river is found on the northern survey, and one corner on the southern survey, and none found on any of the intervening surveys, and the field notes of each survey calling for lines and corners of the adjoining surveys for its own lines and corners, and the undisputed evidence shows an excess in distance over that called for in the field notes of the different surveys between the two original corners found and identified, and the sketch made by the surveyor in locating said block of surveys shows all of said surveys to be tied together as one piece of work, and when no ambiguity or conflicting calls appear in either of said field notes or upon said sketch, then as a matter of law the excess should be prorated between the said several surveys accord-

ing to their respective widths as called for in the original field notes.' "

In Miller v. Meyer the Court made the following quotation as correctly stating the law applicable to that case [190 S.W. 250]:

" 'Adjoining surveys made by the same surveyor within a few days of each other, mapped with a common division line and calling for each other, will appropriate the land the one to the other. Very clear evidence would have to be adduced to justify the conclusion that any vacancy existed between such surveys as actually made.' "

In Stanolind Oil & Gas Co. v. State, the Court said [129 Tex. 547, 101 S.W.2d 806]:

" 'We also unconditionally hold that block 1 [being Block 1, I. & G. N. Ry. Co. Surveys in the Yates Field in Pecos County, Texas] is a system of connected surveys made by the same surveyor at the same time; the surveys being built one upon the other from the South to the North.' "

In Welder v. Carroll a map was the only guide which the Court had in locating the land in suit, the Court saying:

"There appears, from an inspection of the map no difficulty in ascertaining and laying down the external lines of the two surveys. The difficulty is in locating the dividing line between them, arising from the fact that there is not sufficient land contained within the external lines to satisfy the claims of both. In describing the seven and a half league survey, the division line is indicated by the letters C D, while in the triangular figure referred to, to designate the Power & Hewitson tract, the same line is called for by the letters C K. Yet an inspection of the map shows two parallel lines with these three letters. It cannot, therefore, be certainly told from the map which of these lines was intended by the surveyor as the divisional line."

The Court held that the deficiency in acreage should be prorated between the two surveys.

In Standefer v. Vaughan it was said [219 S.W. 491]:

"It is shown with reasonable certainty the two blocks were put in by the same surveying party at practically the same time. The calls and field notes tie the two blocks together and show no actual vacancy as claimed by appellant, and evidenced that it was the intention of the surveyor to tie them together."

In all of these cases the surveys or blocks were tied together by field note calls except in Welder v. Carroll where a map, in the absence of field notes, was resorted to for this purpose.

The remaining authority cited by appellees on this question is Duval County Ranch Company v. Rogers. The opinion in this case cites Clement v. Packer without criticism and cites other Texas cases as approving the doctrine of that case. The purpose of this case was to establish a vacancy between the south lines of surveys 202 and 201 and the north lines of surveys 203 and 204. On rehearing the Court said [150 S.W.2d 886]:

"As stated in the original opinion, the map prepared by French indicates that the north boundary line of Surveys Nos. 203 and 204 is also the south boundary line of Surveys Nos. 201 and 202. The French field notes of the surveys involved also show that it was the surveyor's intention to establish a common boundary line between Surveys Nos. 201 and 202 on the north and Surveys Nos. 203 and 204 on the south. As pointed out in the footnote to the original opinion, the field notes of Survey No. 203 place the northeast corner thereof in the south boundary line of Survey No. 202. This clearly demonstrates French's intention to

establish a common boundary line between Surveys Nos. 202 and 203.

"In the French field notes for Survey No. 201, the call establishing the South boundary line of said survey is west 1,663 varas from the S. E. corner.

"The original field notes of Survey No. 204 call for the northern boundary thereof to run west (French's call for course reversed) 1900 varas from Point F–4.

"French's field notes of Survey No. 205 begin at Point F–3, run north to F–4, the northeast corner of Survey No. 204, 'thence West 154 varas to S. E. Cor. of Sur. No. 201.' The southeast corner of Survey No. 201, according to the field notes, therefore lies due west of Point F–4, and therefore calls for a west course from either F–4 or the southeast corner of Survey No. 201, are calls for an identical line. French's field notes therefore indicate his intention to establish a common boundary line between 201 on the North and 204 on the South."

It is to be noted that the common line between surveys 202 and 203 is established by the field note call for the N. E. corner of 203 as being in the south line of survey 202, thus satisfying the requirement that one survey should call for another in a system. The common line between surveys 201 and 204 is established from the fact that the field note calls of the two surveys call for an identical line, and, per force, they must have a common line.

We realize, however, that the opinion in Duval has broader aspects. This is emphasized by the Court citing Beck v. Gulf Production Co., Tex.Civ.App., El Paso, 113 S.W.2d 258, writ ref. That suit was to recover lands allegedly omitted from partition deeds. The Court very properly held that the entire tract to be partitioned was a block and that all interior lines should be located harmoniously. That principle is applicable to Duval. There the applications filed with the County Surveyor specified that the certificates be satisfied by taking up unappropriated land lying between the Dix surveys on the east and the French surveys on the west. The surveyor miscalculated the proper relation between the Dix and French surveys and mistakes resulted. Under these circumstances the Court held that field notes embracing within their external boundaries all unappropriated public lands lying between the Dix and French surveys constituted one block or system so as to preclude the existence of a vacancy within the block.

As shown above we have no comparable fact situation. The Garcia and Zuniga surveys were not to be laid so as to appropriate a vacant area lying between established surveys. Hence there was no block to be divided or partitioned. Nor, in the absence of connecting calls, was there system.

Our conclusion is that the Garcia and Zuniga surveys do not constitute a block or system of surveys but that they are independent surveys taking their respective positions upon the ground as above indicated thus leaving as vacant the tract sued for by appellants.

In accordance with this conclusion the judgment of the Trial Court is reversed and judgment is here rendered for appellants.

Reversed and rendered.

GRAY, Justice.

I respectfully dissent from the conclusions of the majority. I also do not agree with the findings of the trial court adopted by the majority which findings are inconsistent with the view here expressed. I especially disagree with finding No. 7 wherein the trial court found that there is an excess distance of 632 varas in the most southern south line of Survey 298.

The only problem presented is the distance of the most southern south line of survey 298. The majority constructs the survey from its finding of the length of this line. They say that McDonald called this line to be a total distance of 1458 varas and for this reason found a vacancy to exist.

Referring to the map attached to the majority opinion the beginning point of survey 298 is accepted as correct. It is later referred to as point A. McDonald called to begin the survey at point A and to go "N. 60 deg. E" to point B, ("a stake and mound"). His called distance to be later noticed. He then went "N. 30 deg. W" 2578 varas to point C ("a stake and mound"). He then called to go "N. 60 deg. E crossing two creeks" 3232 varas to "a stake." Point D. This point is recognized as established on the ground. Then there is no controversy as to the location of points A and D. The majority adopts the trial court's finding that McDonald was on the ground at all points where he called for bearings to natural objects, that he "actually ran a connection between" point A and point D and that he made a mistake in chaining the distance.

In attempting to trace the steps of McDonald we know that he began at point A. We know that he then went generally east 500 varas to a Creek (this is shown to be a correct call), and following this call his field notes say: "1458 varas to a stake and mound." Point B. It is my opinion that McDonald called to go 500 varas to a Creek and 1458 varas more to "a stake and mound" giving the length of line AB (the most southern south line of survey 298) a total distance of 1958 varas. (Similar calls are often found in early surveys though the word "thence" or a word of similar meaning is often inserted before the second call. However we are here concerned with what McDonald did rather

than with his selection of words to express his acts.)

What has just been said is evidenced by the facts that McDonald correctly called the distance from his beginning to the Creek (500 varas) and that he did not stop there but proceeded to a stake and mound— Point B. From there his call for distance to point C is substantially correct as is his call for distance from point C to point D the location of which latter point is not disputed. The majority say this last call falls 621.75 varas short of reaching point D and that McDonald made a mistake in calculating the ground distance between points C and D. This results from the holding that McDonald's call for distance from point A to point B is 1458 varas. If line AB is given a total distance of 1958 varas the total distance from point A to point D is short some 121.75 varas. However this may be accounted for by a mistake in the call for distance in line AB or in line CD or in both and in the variations used by McDonald in the course of these lines.

Turning now to the other evidence in the record it shows that Howard made a request that the survey be located upon creeks. Apparently this request was honored by McDonald for he called to cross the creeks and on his sketch accompanying his field notes (shown in the majority opinion) he showed the creeks.

If survey 298 is constructed in accordance with the lines herein discussed it is not necessary to trace the remaining lines of the survey for the reason that the field notes close and show the land that was surveyed by McDonald.

It is my opinion that a vacancy is not shown and that the judgment of the trial court that the plaintiff and the State take nothing against the defendants should be affirmed.